Good morning. You are saying it correctly. Very good. Good morning, Judge Wynn. Good morning, Judge Smith, and good morning, Judge Gould. My name is Dale Gallipo, and I'm representing the appellant, Carole Krechman, who's president in court and seated at the table is Thomas Seaborne from my office, who helped in writing some of the briefing in this case. I'd like to focus, if I may, on the issue of whether it was appropriate for the district court to rule as a matter of law that there was no evidence to support the claims. I've tried about 200 jury trials, and I must say, without going into everything, that it was a unique experience. But some of the comments we made and potential bias in favor of police because of some of the comments made by the judge. But I'd really like to focus on that issue, if I may, because I think that's the simplest issue for the court to address. On review de novo, as I understand the law, the court needs to accept, for the most part, the plaintiff's evidence and take all reasonable inferences from that evidence and see if there's evidence to support the claim, similar to review on a summary judgment. There's no weighing of the evidence, and there's no credibility determination. It appeared from the record, from the comments of the district court judge, that that's what he was doing, weighing the evidence and making credibility determinations. The three claims that went to the jury were essentially a Fourth Amendment excessive force claim, a battery claim, which is, for the most part, the same or similar standard. And a negligence claim. Interestingly, in the appellee's response, they suggest that the judge did not consider expert testimony at all in making his opinion. But that doesn't appear what the record suggests. Three days before the incident, the decedent, who was an attorney and 48 years old, was arrested for a DUI offense. And there was an altercation and pepper spray involved, and he ended up in the hospital. And on the day of the incident, there was a 911 hang-up call. I think that's important because some of the Graham factors include the severity of the crime and things of that nature. Essentially, there really was no crime. The officers thought it might be a 51-50. He was making strange statements. When the second officer arrived, who was Deputy Chacon, Mr. Appell was sitting Indian-style on the street. And basically, they said, you're not under arrest, which is also important. It was a detention, so the force has to be judged in view of a detention. They asked him to put his hands behind his back. He initially said okay. Put his left hand behind his back, which was cuffed. Put his right hand behind his back. And according to Deputy Garcia and Chacon, he then pulled his right hand away, saying something to the effect, oh, no, not again. Well, the big issue in this case is causation. And it strikes me from reviewing the record that Judge Wright focused heavily on the lab results, which he thought was an impartial piece of evidence versus the dueling expert testimony. So can you quickly sum up for me what your experts testified to, the best inferences that can be drawn from your experts' testimony establishing causation? Yes, Your Honor. The medical examiner, Dr. McCormick, testified. He had ruled the case a homicide, death at the hands of another. The defense position was that Mr. Appell died of acute renal failure. That was their theory of the case based on the lab results, the elevated magnesium and potassium. Dr. McCormick said he did not die of acute renal failure. His kidneys were fine. They were examined on autopsy. And also his prior hospitalization showed no evidence of any kidney problems. He further stated once someone dies by a cardiac event and then followed by resuscitation efforts, the body starts breaking down, and the magnesium and potassium from the cells are leaked into the bloodstream. So you're always going to have elevated levels of potassium and magnesium. And Dr. McCormick was confident he did not die of acute renal failure. Otherwise, he would have judged it a natural death. Dr. O'Halloran, who has some expertise in restraint dysfixia, and I think it bears mentioning that all the officers conceded in their training that they were aware if someone is prone and you put weight on their back for a period of time, it could interfere with their breathing and cause them to die by restraint dysfixia. And that's what we think exactly happened in this case. Dr. O'Halloran concurred with Dr. McCormick. He did not die of acute renal failure. And he explained a similar explanation. What Dr. O'Halloran said, if he was prone with weight applied to his back, 100 or 200 pounds, for a period of approximately two minutes, in his opinion, assuming those facts to be true, he died of restraint dysfixia. We believe there's evidence in the record, Deputy Chacon testified that after he was handcuffed, and interestingly, Deputy Garcia said he wasn't struggling or resisting at all after he was handcuffed, that three deputies, Alfaro, Dusik, and Chacon were on his back holding him down for approximately two minutes. It was after that that he appeared unresponsive. Interestingly, Deputy Alfaro thought he was playing dead. And as the record bears out, Deputy Alfaro stood on him for another 30 seconds to a minute to make sure he wasn't playing possum. After that time, they immediately ---- I apologize for interrupting your argument, but let me just ask a question that might oversimplify this, but it'll help me understand it at least. As I see it, you've got two doctors. You've got the coroner or medical examiner, and you have your expert. Both of them pin the death on asphyxiation from the cop sitting on the chest while his hands are behind his back. On the other side of the case, they've got an expert who's talking about renal failure, and they've got lab reports that show high levels of magnesium or potassium. I thought also there was something about creatinine. But, you know, there's two sides of the case. But in an overly simplistic way, as I understand it, after the jury hangs, the judge is sort of sat on the Rule 50 motion. And after the jury hangs, instead of sending it for retrial, he decides as a matter of law that there should be judgment for the defendants. And your position is that the two doctors you have are giving sufficient evidence that a rational jury could find liability, and therefore he wasn't allowed to weigh that evidence, so we should reverse and send it back. Isn't that all there? I mean, there could be more, but doesn't that summarize the case? Very well. Yes, thank you, Your Honor. It does. And in fact, add to what Judge Gould has said, in this particular matter, and I'm on a standard of review here, you get all the possible inferences drawn in favor of you, and all the evidence favorable to the moving party I disregard, not entitled to have any part in my determination. For purposes of this review, that is correct, Your Honor. When the judge said about your expert, you know, I don't have to believe a guy who's an expensive paid expert who comes in from wherever he came from. In fact, he was wrong on the law. He does, on a motion under Rule 50 against you, he has to believe your expert if your expert's testimony was admissible. That is correct, Your Honor, and I think that's a very important point because from the record, he appeared to say, gee, I like one theory more than the other, or I find credibility more in one expert than the other, too, and I think that was an improper standard for him to select in throwing the case out. So our position is, obviously, this case should be sent back down and retried by a jury. We would prefer a different judge, but we don't know if that's possible. This may be outside the record, Mr. Guillebeau, but help me out here. I saw something in the record towards the end there when the jury came back hung, that one of the attorneys asked, I don't know if it was you or your opposing counsel, if the court could inquire as to the split of the jury. Was that ever done? It wasn't. Did you eventually find out how the jury was split? It wasn't specifically done, and what was even more interesting is the district court judge thought that, for example, if it was 7-1 in the plaintiff's favor, that was an automatic defense verdict. He was not aware that you could have a hung jury and then that would be a retrial, and that discussion took place, for the most part, off the record, and then after he discovered that, he then decided to rule as he did on the motion. But we never got a clear understanding. It's my recollection in talking to some of the jurors, they were about equally split. We felt that there were certain other issues in the trial that may have affected that, but I don't think we need to get there for today's purposes. When you said I had the idea that one of the issues you were raising was that I ought to send this to a different judge, what do you believe is the standard for making that determination? I am not 100 percent sure, but I believe it's a very high standard of bias. Don't I have to have bias or, on the other side, just almost impossible circumstances? I believe it's an extremely high standard. I can tell you that it was a very unique experience. I think defense counsel will share that view. But in any event, we would be very pleased if we're able to at least go back, have another trial, either try to resolve the case or at least have it decided by another group of folks. Counsel, when you were involved in this trial, is there any indication from you that Judge Wright would not follow our directive? I mean, we're going to make a directive here. Well, it's hard to say. I only had the one experience with him. I've talked to several other attorneys that have been before him, and I know he's had several cases before this court already. I would hope that he would follow the ---- The problem is some of his comments during the trial were so bothersome, and some of his antics and expressions that don't show up on the record. As a witness was testifying in every answer, he was making different expressions that kind of was telegraphing how ---- what he felt about that particular witness. But comments such as, I'm a police officer, police officers have each other's backs, a comment to the juror that we mentioned in the opening where she was concerned that her son might be sexually assaulted, and he told the juror, you should be happy that that happened, and buy the officer a cup of coffee. There was a lot of very strange comments, and I think the jury had the particular impression that he was completely biased in favor of the police and thought very little of my case. And so we're concerned, of course, if we go back there, that it may be difficult to get a completely fair trial before him. But if that's our only alternative, we'll obviously take it because ---- Counsel, I saw that in your brief, and of course it's hard to look at any one case in total isolation, even though we try to look at the merits of it. We've also had other controversies lately about reassignment of judges in other cases, and that's causing a number of us to be pondering what the standard for that should be and how extreme it should be. It's sort of obvious if we give a mandate on something and a judge doesn't follow it, it's easy to reassign that. But if a judge just makes a mistake, you sort of wonder, can't we lay out the principles or lay out a roadmap for how it should be done and that a judge should be able to follow? I would hope so. I would hope so, and if that's the way it goes, then that's the way it goes, and we're very happy for that. We just felt it was a very different experience, and my biggest concern, not so much for myself but for the mother of the young man who died, it was a difficult experience for her because that was her first experience with the justice system in that regards. And I think attorneys on both sides, that's all they really want is a fair trial, and it was a difficult experience. Thank you, Counselor. Thank you very much. Good morning, Your Honors. Bruce Diesenhaus on behalf of the appellees. Probably best to start by addressing the issue that Judge Gould wanted addressed and that Judge Smith has also discussed. Mr. Gallipo indicated that his two experts, the county coroner and Dr. O'Halloran, opined that positional asphyxiation was the cause of death. Unless I participated in a different trial, Coroner McCormick indicated that the cause of death was sudden cardiac arrhythmia that was brought on by the struggle with the officers. He didn't attempt to analyze what the specific mechanism for the cause of death was. He didn't do an analysis of whether or not this was acute renal failure. He did no microscopic studies of the kidney tissue to determine whether Mr. Appell was in acute renal failure. Dr. O'Halloran's retention was not as a regular expert, but as a rebuttal expert. And Dr. O'Halloran readily admitted that he's never treated a live patient. Dr. McCormick admitted the same thing, and that he's never had to treat anyone who's in acute renal failure. However, the judge allowed his testimony, and therefore foundation is out the door. We've got the testimony in front of us now, and we have to give every benefit of the doubt to the testimony. And I'm not saying... And I share Judge Smith's concern. You know, just trying to keep it as simple as I can make it, why isn't the testimony of those two experts, for the coroner plus the expert, well, why aren't those sufficient to let a rational jury look at the matter and make its decision? Well, if you take it from the coroner's perspective, he didn't attempt to analyze what the cause of death was. He analyzed it from the sense that it was sudden cardiac arrhythmia. He did also suggest what the potassium level was, right? Over 10, and the magnesium level was 5.2, well over the normal level. So he did all of that. All he said was they can be explained by different situations, and I think that's what you're arguing. It could be explained by being resuscitated. It could be explained by renal failure, but he couldn't diagnose that because the person had to be alive. And it could be consistent with chronic alcoholism. Right. I mean, he said a lot of things. But when you add O'Halloran on the top of that, and O'Halloran says more than two minutes, there's no question, and you've got this evidence in front of you, there's where Judge Gould is. Well, the problem with that is that Dr. O'Halloran started his testimony by indicating he had insufficient evidence presented to him to make a determination that this was a positional asphyxiation case. In order to even address the subject, he indicated that he would have to make certain assumptions. He indicated in his testimony he didn't have that foundational basis. When you look at the computer time stamp for the amount of time that any weight was on the body, the time of the struggle was 61 seconds, far less than the two minutes that Dr. O'Halloran suggested was the minimum amount of time necessary to cause positional asphyxiation. More importantly — Aren't there disputed time frames, though? Aren't there disputes about how long they were on the body? There are. There was some evidence from which you could conclude it was less than a minute, so no problem, but that there was also other evidence from which a jury could have concluded that they were on his back, you know, for two and a half, three minutes or whatever. Arguably, I suppose that's true. But then there's a second component to Dr. O'Halloran's testimony, and that is at a minimum there would need to be 200 pounds of weight on Mr. Appell. Try as hard as Mr. Gallipo could, we never got to 200 pounds of weight. Regardless of whose body you had in the area that was likely to cause positional asphyxiation, you never got to 200 pounds. There was no foundational basis for Dr. O'Halloran to testify that this death was caused by positional asphyxiation. Okay, but the judge admitted his testimony, right? So this seems to go to the weight of his testimony. Maybe I'm misunderstanding. If the judge admitted his testimony, the arguments you're making now, although I could be wrong, seem to me to go to the weight of the testimony. Therefore, you could argue it to the jury and you could argue it to the judge if he was trying it, but the judge couldn't just make a decision based on what was submitted, you know, giving the inferences to you rather than the other side. Well, I don't think that's... I'm seeing it that way. So what's wrong with how I'm looking at it? What's wrong with it is that in order for there to be an improper basis for granting a Rule 50 motion, you would have to have sufficient evidence that would sustain a verdict that there was excessive force and that there was causation, that the force caused the decedent's demise. Dr. McCormick doesn't get them there because he never addresses the root cause of the sudden cardiac arrhythmia. He posits a whole number of potential theories, none of which are the subject of Judge Wright's decision. The only other supporting evidence comes from... Well, he does say if no struggle, death would have been natural. Correct. I don't know what that means in the analytical framework, honestly. Well, I'm trying to just read his testimony and give every inference I can, as I must, to the opposition. I mean, the things that he said, if no struggle, death would have been natural. Because struggle was a stressor, death was a homicide, meaning other factors contributed to the death. The potassium level was over 10, and the magnesium level was 5.2, well over the normal level. After that, I can't get any more out of his testimony. You probably got more out of it than... Than you would. And Judge Wright did as well. Well, the difficulty with your argument, I think, Counsel, is that you obviously think that the inferences to be drawn from plaintiff's expert's testimony are very weak, and apparently Judge Wright felt the same way. And in ruling on the motion, he basically said, well, these witnesses aren't credible, aren't believable, so I think that's a problem, because even assuming the inferences are weak, those inferences are entitled to be argued, and the jury could accept those, in your view, weaker inferences over what you may view as more compelling inferences based on your own expert testimony. Isn't that what's wrong with Judge Wright's ruling in granting the motion? He didn't give the plaintiffs the inferences that they were entitled to argue for the jury. But still, those have to be the kind of inferences that reasonably can be relied upon by a jury. I don't think anything that Dr. McCormick said actually would help the jury determine causation, because he really never got to the root cause. With Dr. O'Halloran, Dr. O'Halloran started his testimony by indicating, as he did in his Rule 50 report and as he did in his deposition testimony, that he had insufficient evidence to make a true determination as to what the cause of death was. Since the burden of proof on that issue always rests with the plaintiff, I don't know how Judge Wright's analysis runs afoul of the standard for a Rule 50 motion. But didn't Dr. O'Halloran suggest that he died from positional asphyxia based on the struggle with the officers which led to the arrhythmia? Didn't he say that? He did, but he did it only after saying he really had insufficient evidence to make that determination. I don't know how it gets any clearer than that. He's positing a theory for which he himself admits he has insufficient evidence to base it on. I appreciate that he says that he doesn't have sufficient evidence to opine that the combined weight of the officers was sufficient cause, but he really is saying if the struggle lasted more than two minutes, that's the cause. And so then we get to the timeline. That's what we're really going on. And so once he says, hey, they died because of positional asphyxia, it's based on a struggle with the officers. I don't know whether it was two minutes or it wasn't. But if it was more than two minutes, there it is. And then we get to the timeline. And then we got Officer Chacon arriving at the scene. We've got what they did from 1037 through 1050. And we've got, in my mind, contradictory evidence about how long the officers are on him. The struggle, the two minutes of struggle from 1037 to 1050 when the paramedics arrive is certainly subject to dispute. Maybe the weight of the officers, they can never get there. But I'm having a tough time reviewing the testimony to say it's clear there couldn't have been two minutes. And he said two minutes is enough. Then that then morphs into the discussion of whether simply engaging in a struggle that lasts for more than two minutes constitutes excessive force. Well, but that's what the jury was to decide. But I don't think without more, simply saying if officers struggle with a suspect like Mr. Appell for more than two minutes, that that by its very nature, without going farther. Well, but what you're really arguing is now the judge is taking away from the jury the chance to decide that fact. With this evidence well in front of them. And that's what they decide are facts. And they got enough expert testimony to say two minutes is enough. They got the timeline to say it might be. And now the jury decides if that's excessive. The judge doesn't say anything about why excessive force is bad or why it was or wasn't. He's all focused on tests and experts. And he's saying tests are wonderful and experts. Some are too rich. Some get paid too much. And coroners don't know what the hell they're doing. That's what he's saying. Well, yes, he did make those comments. But he also addressed both at the time that the Rule 50 motion was first made and after the jury indicated its deadlock that he found that the amount of force that was used was not excessive under the circumstances. Well, again, that's. Isn't that a question for the jury under proper instructions? That is, there were jury instructions on excessive force. Correct. You're really not going to have any. Go ahead. Sorry. Well, if the jury is instructed and you, you know, you're not objecting to the instructions, isn't it like in their ballpark then? I'm not suggesting for a moment that it's not potentially in their ballpark. And I didn't object to the model Ninth Circuit instruction on the use of force because that's about as clean and as straightforward as it gets. But I think what Judge Wright was talking about was that if you look at the totality of the circumstances, you can't say when there's no use of TASER, when there's no use of batons, when there's no kicking or stomping. And those are his words, not mine. That simply grappling with someone, whether it's for 60 seconds or two minutes or some time in excess of that, does not by that nature imply that there's a constitutional violation. Is that a question of law, Counselor? It can be. I don't know how it can be. I haven't found a case to suggest it. I don't know a case that says that two minutes of grappling is enough or two minutes of grappling isn't. And I further don't find a, I don't find a case, and I don't think Judge Wright would have allowed you to present an expert to say what we're really now talking about. What is excessive force? That's the jury's bailiwick. I didn't ever let anybody come in and try to tell the jury what was excessive force or not. I don't think Judge Wright would. That's the jury's bailiwick. So for the judge to talk about excessive force, he's assuming a question of fact. He can let in all evidence, but nobody tells the jury what's excessive force and what isn't. They determine that. And that's why it's important to focus on what experts come to the trial. Wouldn't you agree? In most cases, I'd agree with you. Well, you know, Counsel, the inferences that the plaintiffs are asking the jury to draw in this case are sufficiently compelling to hang the jury. I understand they deliberate it for a number of hours. And so assuming we send it back for retrial, I'm not saying that's what we're going to do. We haven't discussed it. But there's one way to avoid a retrial for both sides in this case, and that's called settlement. Now, they were split, as Mr. Gallipo said, about 50-50, and the plaintiff does need unanimity. It's going to be conflicted the next time around, too, in terms of evidence presented. I understand that, Your Honor. And to answer the Court's question that it posed to Mr. Gallipo, having spoken to the jurors post-discharge, the split was 7-1 for all of the defendants that they did not reach a result on. It doesn't matter if it was 7-1 or 3-4. I know there was one juror who had a problem with what the officers did. I talked to her, and I could have had 600 experts, and it wouldn't have mattered to her because someone died as a result of a struggle that she felt someone shouldn't die from. But Judge Wright made the same comment about discussing settlement. Counsel, we've got you over your time, but I wanted to just, if Judge Smith and Judge Wynn don't object, ask you to address one final question here, and that is, assuming for a moment that we send it back, and you've made an excellent, spirited, and ethical argument on behalf of your clients, but if we go the other way and feel that it wasn't proper under Rule 50 and it goes back, I'd like to hear your perspective on whether it should go to a different judge or whether Judge Wright could follow the law, whatever our panel declares it to be, on a retrial. I have no qualms about the matter going back to Judge Wright. I have no doubt that whatever instructions this court provides him, he will follow. I'm not going to tell you he's going to like it, but I have every belief that he would follow those instructions. No one exactly had a party trying this case with Judge Wright. There are a lot of discussions that took place off the record that were as painful for me as they were for Mr. Gallipo. He gave it to both sides. That said, I think if we have to retry this case, he will do what this court instructs him to do. Thank you, Counselor. I appreciate your answer. I think we might have 60 seconds just on a few factual issues. Okay, we'll give you a minute. Okay. Dr. McCormick, as you pointed out, ruled it a homicide and did not think it was acute renal failure, and he had the lab results. Dr. O'Halloran said the struggle caused the death. He said if it was between 100 and 200 pounds for two minutes or more, it was restrained asphyxia. And you may remember that one of the officers, Alfaro, started recording with his iPhone immediately after he became unresponsive, and that time was 1046. Paramedics didn't get there to 1050. The initial call saying he was detained, they're saying that was only him being handcuffed. He was still responsive at that point. After that, he was facedown, and that's where we believe the strong evidence of the additional excessive force, three people on him. Deputy Alfaro himself testified he had 105 pounds on his back. He was one of three officers. And as I mentioned earlier, Deputy Chacon said there were three people on him for approximately ten minutes, two minutes, after he was handcuffed, after he was prone. And so I think the temporal proximity of the cardiac arrhythmia is almost too much to overlook. If you believe the defense case, he just happened to die of acute renal failure at that very second. Thank you. You've taken your minute and another half minute. Thank you very much. Thank you. Case 1255347 is submitted. Judge Gould, would you like a recess? I think, although I hesitate because I think we've only got one more case to be argued, perhaps, but I would appreciate it if we could take a ten-minute break. I was going to do that before the last case. You assigned me this heavy responsibility of conducting, and I got so involved I forgot. So we will take a ten-minute recess. All rise. Is there just one case left? Court is adjourned on a ten-minute recess.
judges: Gould, Smith, Nguyen